### COOPER v. OTIS CO.

(Circuit Court of Appeals, First Circuit. January 19, 1909.)

No. 769.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—KNITTING MACHINES.

The Hurley patent No. 572,679, for improvements in circular knitting machines designed to meet the demand for a machine which would produce tubular fabrics of large sizes for underwear, discloses novelty and

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

patentable invention, and has for its primary purpose the abolition of the inside cam and stationary arm of prior machines. As so construed, claim 4 *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For opinion below, see 156 Fed. 665.

Charles F. Perkins and William K. Richardson (Everett N. Curtis and Fish, Richardson, Herrick & Neave, on the brief), for appellant.

William A. Macleod and Franklin Scott (Macleod, Calver, Copeland & Dike, on the brief), for appellee.

Before PUTNAM and LOWELL, Circuit Judges, and ALDRICH, District Judge.

ALDRICH, District Judge. We have to deal here with the patents which are described in the opinion of the Circuit Court reported in Cooper v. Otis Company (C. C.) 156 Fed. 665.

We view this case as one having reference to a situation in which the trade required a machine that would produce knitted fabric tubes suitable for the ordinary and the larger sizes of underwear. It seems beyond question that the demand of business was for the spring-needle product, as something superior and decidedly preferable to the product of the machines of the latch-needle type, which in use and washing loses shape. It is from that point of view that we must consider this case.

It is likewise beyond question that, at the time Hurley came into the field, manufacturers, and those skilled in the art as well, were struggling with spring-needle machines which were only capable of turning out small-sized fabric tubes suitable only for cuffs, sleeve-ends, and drawer-bottoms, and which were subject to the further limitation of a necessarily interposed inside cam between the two cylinders, which prevented the fabric from passing right side out through the secondary cylinder. We deem it significant that Carr, whose work in this particular field was probably the most important until that of Hurley, failed in his undertaking to meet the requirements of the trade by building a machine of his type which would turn off tubes suitable for the larger sizes of knitted underwear. He undertook to raise the standard of his larger operative machine of something like 8 inches in diameter, and only capable of knitting tubes from something like 4 to 6 inches in width at the most, to that of an operative machine of 15 or 16 inches in diameter, capable of knitting tubes for the required larger sizes of underwear, and did not succeed. It is likewise pertinent and significant that Carr, at the time of these experiments, deemed the cam a thing of necessary functions, and had no idea of removing it from his combination of elements. The various and supposed indispensably necessary functions of the cam were fully and particularly described by Carr in his specification and drawings.

Now, what was Hurley's problem, and what did he do to simplify and advance the art of mechanical knitting by machines of the circular

spring-needle type? To dispense with the undesirable obstructive features of the cam, and at the same time to present an operative machine without it, and one of sufficient diameter to knit tubular fabrics of a size meeting the demands of manufacturers and of the trade, required not only that certain elemental details of the old machines should be dropped, but an ingenious and general reorganization of the existing combinations and substantial changes in the adaptation of mechanical parts, a reorganization which would render it necessary to devise new and additional mechanical plans and schemes of adjustment and adaptation. In the older machines like the Carr, as said, the inside cam was an obstruction to the extent that the tubular fabric could not be removed upwardly and right side out, and unquestionably the leading, if not the primary idea of Hurley was to relieve the situation in this respect by discarding the inside cam altogether. Plainly recognizing the desirability of such a result, the idea is given prominence in the specification at the outset through the unmistakable expression that the machine is to be so constructed as to enable the finished work to be taken up either above or below the cylinders, and the idea is preserved in the apt words of claim 4, "whereby the finished work may be taken upwardly or downwardly from the needles." Hurley further emphasizes the importance of his idea of discarding the inside cam of the older machines through his Fig. 6, as illustrated and explained in his specification, line 93, p. 2, to line 54, p. 3, where, among other things, after describing the functions of the inside cam in the old machine, he says:

"It is clearly evident, then, that machines constructed prior to my invention have not been so arranged that in any one machine the finished work can pass to the take-up either above or blow the cylinders. * * * The object of my particular construction and arrangement of conical needle-cylinders is to remedy the difficulty heretofore experienced in not being able in the same machine to adjust the parts so that the finished work can pass to the take-up from the interior of the cylinders to either above or below the cylinders, and to this end * * * my improved conical cylinders, each of which is of the same form and size. * * * In this arrangement of parts the needles of each cylinder are confined to their own particular grooves, and must necessarily cross each other at h' in the center of the space between the cylinders, as is clearly indicated in the drawings, and the loops formed on the needles are cast off by means of the cams and presses as hereinbefore described, and shown in Fig. 1, and the stationary arm B' and adjustable cam C' thereon for pushing the needle outward, as shown in Fig. 6, are dispensed with, leaving the interior space of the cylinders unobstructed to enable the finished work to extend up through the center of the cylinder to the take-up above."

As the operating accuracy of the knitting mechanism of the Carr machine was in a considerable measure based upon the inside cam, and very largely dependent upon its presence, its proposed elimination by Hurley necessarily presented a situation which required constructions upon substantially different lines. As a consequence, therefore, of eliminating the cam, among other things, the cylinders might and must be brought nearer together, and into minutely close proximity, and at the same time held nicely and evenly apart during their revolutions, to the end that a series of needles supported in their grooves may and must accurately cross each other on a line midway of the

space between the cylinders. Thus under a new situation, created by the absence of the cam, the problem was to devise a firm and compact readjustment, under mechanical conditions which should not only promote, but compel, accuracy and the nicest possible precision and perfection in the mechanical work of the thousand or more co-operating needles upon the swiftly rotating cylinders.

Hurley solved the problem, and successfully accomplished what he started out to do. He removed the inside cam as an objectionable obstructive feature. He rendered its presence unnecessary by providing other and better means for performing its useful functions, and he also found a way for constructing a greatly enlarged operative machine capable of satisfactorily turning out shirt bodies and other tubular fabrics in sizes which met the requirements of the trade. These were the substantial results secured through Hurley's task; and what he did unquestionably "marked a long step in advance for manufacturing uses." It is quite true that the Hurley adaptation has been perfected by subsequent additions and improvements, but his fundamental idea in respect to these important and useful things was present in the patent, and his conceptions and the theory of the operation of his proposed construction were sufficiently described, and as such are entitled to reasonably liberal protection. And, while it is also conceded to be quite true that Hurley is not in the pioneer field, it still remains that the results accomplished were so substantially useful to manufacturing and commercial interests as to commend his work and his claim for favorable consideration, not only upon the question of invention, but upon those of equivalents and infringement as well.

Of course, the solution of the question of the scope of the invention, and of the questions relating to equivalents and infringement, necessarily depends very much upon the other and underlying question as to what should be accepted as Hurley's primary and leading idea. Was it his original purpose to make the two cylinders of the same size and form, or was it to discard, or, as counsel express it, abolish, the inside cam and stationary arm? It makes considerable difference whether dropping the cam was a mechanical detail incidental to the primary purpose of making the cylinders of the same size and form, or whether the size and form of the cylinders was an incident of the reorganization made necessary by dropping the cam. The view of the Circuit Court was that Hurley conceived the simple idea of making the two cylinders of the same size and form. From that standpoint the question of infringement was quite likely correctly decided below; but we are unable to accept that view. We are strongly impressed with the contention that that was not the original and leading idea of Hurley.

We think the reasoning of the Circuit Court was too largely based upon the words of the patent that the cylinders were to be of the same size and form. We do not look upon this declaration of Hurley as a thing of controlling significance upon the precise question as to what was the primary and leading idea, because the size and form would be desirable and quite likely necessary in the reorganization without regard to whether they were viewed as an essential mechanical detail, or as the particular fundamental element covered by the primary

purpose. We look upon these words as referring to a detail of his combination rather than as expressing a single idea, or as describing and controlling a sole conception and invention. Neither do we view as necessarily controlling the fact that the words "same size and form" were not in the original declaration, and that claim 4 as originally drawn without them was rejected and afterwards allowed upon their insertion, because they were doubtless an essential element of a workable reorganization, and therefore necessary, whether primary or incidental, to a valid claim. Or, to state it differently, the insertion of the words "of the same size and form" was to meet the rejection of the Patent Office, a rejection expressly based upon the White patent, which described a machine where one cylinder was cylindrical with vertical slots while the other was conical, and was for the purpose of putting that detail of Hurley's conception outside of the White patent, rather than to make it the sole substantial feature of his invention.

It would seem to be established beyond question—in fact, there was no substantial controversy about it in argument—that the inside cam and stationary arm prevented, or at least impeded, the successful operativeness of the older machines; and we think that Hurley's original and leading idea was to construct a machine without their presence, and in logical sequence that he first discarded the cam with its attendant stationary arm, and then sought to reorganize and assemble the remaining mechanical parts in a way which would enable him to get along without it. The broader problem of a successful reorganization or assembling of the mechanical parts as a whole without the cam and stationary arm of course involved the lesser problem of suitably shaping, adjusting, and grooving the cylinders, and bringing them closer together under suitable supports and proper mechanical adaptations for the new and additional work of accurately moving and directing the needles, as well as the other lesser problem of how to cast off the loops by outside cams and pressers without the influence and aid of the old inside cam and stationary arm.

Our conclusion that the abolition of the inside cam and stationary arm was the primary and leading idea of Hurley finds further support in the fact that the complaints of manufacturers were not directed against the cylinders because of their form, or because they were not of the same size, but against the cam and stationary arm as an incumbrance upon the take-up of the work, and seemingly because the presence of the interposed cam made it impossible to bring the cylinders into necessary proximity with such proper and accurate supports and compact assembling of parts as would be necessary to stand the extra strain of the revolving cylinders of diameter sufficient to produce the larger kinds of underwear required by the trade.

When Hurley took hold of the knitting-machine art, the inside cam of the operative machines of the circular spring-needle type obstructed the free and convenient take-up of the finished tubular fabrics, and they were limited to cylinders of a diameter which could only produce tubes sufficient for sleeve-ends and drawer-bottoms. His contribution to the art was a machine with a free and unobstructed interior, and of a size sufficient to knit such underwear as the trade

required, with its reorganized parts so poised, supported, and mechanically adapted as to make it an operative success.

The inventive novelty and comprehensiveness of Hurley's combination, and the various conveniences and advantages to manufacturing and trade interests, as more fully explained by complainant's experts, re-enforced by the meritorious character of the leading facts and the substantial results to which we have referred, compel us to give the fourth claim of Hurley's patent a broader 'scope than was accorded to it by the Circuit Court, and make it reasonable, we think, to apply a more liberal range of equivalents than the one adopted by the learned judge of that court.

Upon the question of infringement, the defendant's differential argument in respect to its machine and the Hurley machine is, as it seems to us, largely, if not wholly, technically based upon the lack of exactness of particular parts and of adaptations, rather than upon the broader question whether the defendants intentionally and with studied effort appropriated the substance of the Hurley construction under changed mechanical details like substituted parts made of one piece by casting, for the same purpose and to perform substantially the same functions, instead of using brackets and cap plates rigidly united, and casting in one piece gear rings and supporting rings for like purposes and like functions instead of rigidly connecting them, and nuts which turn around the jack screws rather than jack screws which turn around in the nuts. While some of these changes, used here for purposes of illustration, have more particular reference to claims 1 and 2, they relate to details involved in Hurley's conceptions, and in the general scheme of his adaptations, and manifestly bear upon the general questions of good faith and equivalency; and, as we view this case as one to be determined under a reasonably liberal rule of equivalents, the differences are too technical and cannot be accepted as at all controlling. And it is in the same sense that we view the contention that the machines are different because the defendant's needles do not cross in the precise center of the space between the cylinders, while the literal interpretation of Hurley's claim 4 provides for that. The difference in the size and form of the defendant's cylinders is so infinitesimal that they may be said to be substantially the same, and to have substantially the same operative effectiveness as Hurley's. The cylinders are rounded on their inner surfaces, and the secondary needles, not working in the grooves of the primary cylinder as of old, cross within the space between the two. The cam and stationary arm are not there, the finished product may be taken out through the secondary cylinder, and, but for the omission of the detail of the reversible take-up operating mechanism, it might be taken out the other way.

We look upon the defendant's machine as involving a studied and substantial departure from the scheme of construction and operation provided for in machines of the prior art like Park & Ells and Carr, and as involving a substantial adoption and appropriation of the essential conception, and the general scheme of Hurley's work; and, under the rule of equivalents which we adopt as controlling in this

case, we think the defendants have infringed claim 4 of the Hurley patent.

We agree with the Circuit Court that the Hurley invention, so far as it resides in the claims other than claim 4, is not infringed; and we are satisfied with the way in which the Barratt patent is disposed of in that court. We have, therefore, limited our discussion solely to the rights of the parties as involved in claim 4 of the Hurley patent.

The decree of the Circuit Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion; and the executors of the appellant recover their costs of appeal.